# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

UNITED STATES OF AMERICA      )
                                   )
      v.                       )      1:08-CR-74-TS
                                   )
JERMARCUS ROBINSON         )

## OPINION AND ORDER

The Motion to Suppress [DE 25] in this case arises out of a videotaped traffic stop featuring the Defendant hiding crack cocaine in between his buttocks, the Defendant's struggle with several officers, and a fracas between officers and several onlookers expressing their support for the Defendant throughout the incident.

The Defendant argues on several grounds that police violated his Fourth Amendment rights during the incident, and he asks that the Court suppress the recovered narcotics (and the Defendant's subsequent statements) from evidence. For the reasons explained below, the Court denies the Motion.

## BACKGROUND

On September 24, 2008, the Government indicted the Defendant on a charge of knowingly possessing with intent to distribute 50 grams or more of a mixture or substance containing a detectable amount of cocaine base, or crack cocaine, a Schedule II controlled substance, in violation of 21 U.S.C. § 841(a)(1).

On December 8, 2008, the Defendant filed a Motion to Suppress [DE 25], arguing that police violated his Fourth Amendment rights when he was searched and arrested following a traffic stop in Fort Wayne, Indiana, on June 16, 2008. On January 8, 2009, the Government filed

a Response [DE 29] opposing the Motion. On February 26, the Court held an evidentiary hearing at which the following testified: the arresting officer, Shane Pulver of the Fort Wayne Police Department; Special Agent Michael T. Foldesi of the Drug Enforcement Administration; and the Defendant. The Court also viewed and admitted into evidence a video recording of the traffic stop and arrest.

On April 8, the Defendant filed a post-hearing Brief in Support of Motion to Suppress [DE 38]. On April 30, the Government filed its post-hearing Response [DE 40]. On March 15, the Defendant filed his Reply [DE 41]. On June 4, the Government with the Court's permission filed a Sur-Response [DE 44]. On June 19, the Defendant with the Court's permission filed a Sur-Reply [DE 45].

**FINDINGS OF FACT**

Upon consideration of the testimony of the witnesses and the exhibits admitted during the evidentiary hearing, the Court makes the following findings of fact.

**A.      Initial Traffic Stop and Start of Pat Down**

On June 16, 2008, Shane Pulver, an officer with the Fort Wayne Police Department for about four years, was on patrol in the southeast quadrant of the city at approximately 3 p.m. He was near the intersection of Eckart Street and Abbot Street and saw a dark-colored Ford Taurus driving north on Abbot Street. The driver, a white male, "[a]s he passed me, he stared right at me, which I thought was odd, just the look on his face." (Hr'g Tr. at 6:15–17.) Pulver checked the license plate, recognized the driver, and determined that he was a habitual traffic violator, meaning he did not have a driver's license. As a result, Pulver initiated a traffic stop in the 2700

block of Manford Street (which runs east-west and intersects with Abbot Street).

Pulver testified and the video shows that Pulver asked for a driver's license, the driver said he did not have one, and the driver provided an identification card. The driver was David Robinson (no relation to the Defendant). At the same time, Pulver saw a "folded and clipped" pocket knife in the front left pocket of the Defendant, who was in the passenger seat. (*Id.* at 7:10–11; 8:3–4.) Pulver instructed the driver to exit the vehicle, handcuffed the driver, and placed him in the back of Pulver's police car. While Pulver was speaking to the driver, "the passenger was moving around quite a bit. He was moving side to side, and wouldn't sit still." (*Id.* at 17:10–12.) Before the driver even got out of the car, Pulver told the Defendant to put his hands on the dashboard "so I could keep my eyes on his hands and try to attempt to keep him away from any weapons, since I was still by myself." (*Id.* at 8:11–13.) Before Pulver walked the driver back to his police car, Pulver told the Defendant: "Do me a favor, since the sun roof is open, put your hands on the roof so I can see you. You got that knife in your pocket, and it makes me a little nervous." (Video 1:44–1:55[1].) As Pulver was making this comment, a car drove by and pulled over in front of the stopped vehicle. As Pulver walked the driver to the police car, the video showed two women (later identified as the Defendant's sister, Velma, and his girlfriend, Sunny Thompson, (Hr'g Tr. 27:17–28:5)) get out of that vehicle and approach the scene, halting on the sidewalk near the stopped vehicle.

As Pulver returned to the car, he asked the two women if he could help them. Their response was not audible on the video, but Pulver replied, "okay, I'll be with you in a minute."

---

[1] The video recording is contained in six files and is played using MDVSViewer. For reference purposes, the number after the word "video" refers to the particular file of the six files, and the time refers to time displayed in the program (not on the dashboard camera's screen).

(Video 1 at 2:11–2:14.) Pulver then instructed the Defendant to get out of the vehicle, removed the knife from the Defendant's pocket, and began patting down the Defendant on the outside of his clothes and asking him questions. The video also shows Pulver reaching into the Defendant's pockets. When Pulver removed the knife, he "saw an off-white residue on it." (Hr'g Tr. at 8:16.)

During the patdown, when the officer "reached the area of the top of his buttocks area, I felt a hard object." (*Id.* at 9:13–14.) Pulver said that he "couldn't identify it right away, because I kind of lost it. I was trying to find it again, but I couldn't feel for it again." (*Id.* at 9:14–16.) "[A]ll I felt was a hard object and then I lost it. I just caught a quick, brief feel of a hard object, then he straightened up and I lost it and I couldn't find it again." (*Id.* at 32:18–21.) At that point, Pulver testified that he feared for his safety for several reasons: "the car door was open and if it went to a struggle [the Defendant] would know where any weapons would be," (*id.* at 9:18–20); the Defendant, who was not handcuffed, was bigger than Pulver, (*id.* at 37:1–2); and the two bystanders were approaching Pulver from behind, (*id.* at 37:2–3). As Pulver was patting down the Defendant, the video shows the two women moving closer and making comments to Pulver. Pulver also testified that he was by himself for part of this pat down but felt more reassured when another officer arrived and walked over to Pulver and the Defendant. (*Id.* at 37:1–8.)

Pulver testified and the video shows that the Defendant stood behind the vehicle and by the other officer while Pulver looked inside the vehicle for weapons. (*Id.* at 9:18–25; Video 1 at 3:31–4:22.) While the Defendant was standing with the other officer but before Pulver could look in the vehicle, the Defendant's sister and Thompson continued to make comments and ask questions of Pulver. (Video 1 at 3:34–3:58.) During this encounter, the Defendant's sister approached and stood very close to the front of the vehicle while talking to Pulver, who told her

to move back to her own car. (*Id.*) The Defendant's sister then moved slightly away from the car and was joined by the Defendant's girlfriend. They stood there for a few moments during the search and then returned to their own vehicle. (*Id.*) The driver's side door of the vehicle remained open this entire time. (*Id.*) During the search, Pulver testified that he "[i]mmediately saw a small CD case style digital scale that was tucked down between the passenger seat and the center console where the defendant was sitting . . . [and] [t]here was an off-white powder residue on it." (*Id.* at 10:5–7, 13.)

Having observed the knife and scale, both covered with white residue, Pulver believed "it was narcotics," and he further feared that the Defendant might be armed with a weapon because "narcotics and weapons go hand and hand." (*Id.* at 10:20–2.) "Since I knew that narcotics and weapons go hand in hand and I felt that lump that I lost, I wanted to go back and make sure it wasn't a weapon." (*Id.* at 11:3–5.)

### B.      Resumption of Pat Down, Resistance, and Struggle with the Defendant

Pulver then handcuffed the Defendant and resumed the pat down of the Defendant. "I identified a hard lump between my middle and index finger and my thumb." (*Id.* at 11:8–15.) At that point, Pulver "heard a crinkle of the baggie and I felt the lump, I noticed the defendant's buttocks were real tight as he was trying to hold the object between them. I knew right away that it was, the feel and the crinkling of the baggie, that it was narcotics." (*Id.* at 11:18–22.) Pulver testified that even though the Defendant was handcuffed at that time, the Defendant "could try to push it [the hidden object] farther up into his rectum area. . . .[o]r remove it to throw away or crush it." (*Id.* at 28:12–15.)

Pulver and the Defendant were conversing during this process, and Pulver explained that when he was patting down the Defendant earlier, "When I came up through here, it felt like you had something in your ass cheek like that right there." Pulver made that comment as he placed his hand on the Defendant's buttocks. The Defendant replied: "Like what? That's my damn ass." (Video 1 at 5:21–5:31.) Pulver then pulled latex gloves out and moved the Defendant to the hood of the police car so he could remove the item. The Defendant began yelling—"Call the police man. . . . Help somebody. . . . Let me go," (Video 1 at 5:34–5:44)—and the women nearby increased their yelling. The Defendant then pulled away from Pulver and the other officer, and they wrestled him to the ground. (Hr'g Tr. at 12:11–14.) Pulver testified that the handcuffs cut his own arms when they wrestled the Defendant to the ground. (*Id.* at 12:13–15.) The period of time from when Pulver started his pat down search of the Defendant next to the car to this point, when the Defendant pulled away and had to be forcibly pulled to the ground by two officers, was about three minutes and seventeen seconds. (*See* Video 1 at 2:30–5:47.)

As this occurred, the Defendant's sister ran toward and came within several feet of the officers before Pulver told her to get back. She continued yelling at the officers as Pulver put on gloves and prepared to search the Defendant, so Pulver handcuffed her. By this time, the Defendant was on the ground and not in the view of the video camera, but it is evident from the movement of the other officer that he continued to resist. After Pulver returned to the Defendant, it also appears that the Defendant resisted Pulver's attempt to retrieve the narcotics from the Defendant's buttocks. As Pulver began his search, he asked the Defendant several times, "Are you going to let go?" and told him to "let go," (Video 2 at 0:12–0:22), referring to the Defendant's clenched buttocks. Pulver pulled the Defendant's shorts down two or three inches to

reach the object hidden in the Defendant's buttocks. (*Id.* at 13:3–4, 10, 12-13.) Pulver said he pulled the shorts down "just to the top of his [the Defendant's] butt crack." (*Id.* at 14:4–5.)

> I approximate only three inches. I just pulled it down far enough. It was not far, but I pulled them down to where I first saw – I just pulled them down far enough to retrieve it. I didn't, like I said, I didn't pull his shorts down to his ankles. There was – it was nice, sunny, summer day, people driving by. I wasn't going to strip search a man out on the public street. I just wanted it far enough to secure the evidence and the item that I felt.

(*Id.* at 40:10–17.) "[S]ince we were in public, I didn't want to strip his clothes off of him. I just pulled it down far enough to retrieve the item that I felt." (*Id.* at 27:14–16.) On the video, Pulver several times asks the Defendant: "Are you going to let go?" (Video 2 at 0:10–15.) "I kept telling the defendant to just relax so I could remove it. He refused. He continued to scream and yell that we were raping him, to call the police. I finally was able to remove the baggie. But since his buttocks were so tight and clenched, the baggie ripped as I was pulling it up." (Hr'g Tr. at 13:20–25.) Pulver also noted that the Defendant's shorts were sliding down during the struggle. (*Id.* at 13:12–13.)

Pulver testified that the baggie was at the top of the Defendant's cheeks, not "down underneath where you would sit." (*id.* at 14:7–8.) He testified that he did not "look up his rectum or anything, I just looked in the area where the baggie was," (*id.* at 29:2–3), "I didn't go fishing – fishing any deeper," (id. at 29:8), "I didn't spread his cheeks apart," (*id.* at 29:13), and "I didn't stick my hand, rub my hands down his cheek or anything," (*id.* at 29: 16). Pulver said it was obvious where the baggie was, and he did a visual check of that area, but no further below, to ensure there was no other contraband. (*Id.* at 28: 21–29:19.) He did not have to perform a full strip search to retrieve the baggie from the Defendant's buttocks. (*Id.* at 40:4–7.) Pulver said he was unsure if he pulled the Defendant's shorts back up. (*Id.* at 30:12–15.) Pulver testified that he

was generally aware that vehicles were driving by and other people were watching the incident, but he did not know if children were present. (*Id.* at 34:17–35:3.)

The Defendant testified that his shorts were lower on his buttocks when he was on the ground, and officers pulled and held his pants up as they picked him up and put him in the car (47:12–19.) The Defendant said his penis and scrotum were exposed and on the ground when he was laying on the ground. (*Id.* at 47:20–48:1.) The Defendant testified that men, women, and children were watching the incident. (*Id.* at 48:10.) He testified that one officer put his foot on his neck and another officer put his foot on the Defendant's legs in order to restrain him. (*Id.* at 48:16–49:9.) The Defendant testified that he did not comply with the officers' commands and that he "couldn't" relax as he was instructed. (*Id.* at 50:14–17.)

### C.     Placing the Defendant in a Police Car

Pulver tossed the baggie onto the hood of his police car. While this was occurring, a female bystander is heard screaming, and a man is heard saying "take a picture." Pulver believed the substance was crack cocaine, and a field test confirmed that suspicion. (*Id.* at 14:19–21.) Pulver testified that even after he removed the baggie, the Defendant "was still combative. I believe . . . his legs had to be hobbled to keep from kicking other officers." (*Id.* at 15:4–6.) The movement of the officers and the yelling of the Defendant on the video support this. When the officers applied the hobbling restraints, the Defendant is heard yelling "They rape me . . . . [T]hey raping me." (Video 2 at 4:20–25.)

Pulver agreed during cross examination that, when the Defendant was placed in the police car after Pulver retrieved the baggie, the Defendant's shorts were about halfway down his

buttocks. (Hr'g Tr. at 25: 1–4.) Pulver said he did not "believe I pulled them down that far. They may have come down even farther since he was moving around and still – still combative." (*Id.* at 25:8–10.) The video shows that the back of the Defendant's shorts were about halfway down his buttocks when four or so officers placed him in the police car. (Video 2 at 4:45–50.) The Defendant testified that his shorts were much farther ("a lot farther") down his buttocks than they appeared on the video. (Hr'g Tr. at 47:9–10.) Pulver testified that the Defendant was placed in a screened-in police car, or full cage. (*Id.* at 31:4–11.)

**D.      Other Relevant Testimonial Evidence**

Pulver testified that he believed but was not certain that narcotics detectives strip search arrestees at police headquarters. (*Id.* at 35:10–12, 18–20.) "I believe so. I'm not sure what they do. But I know they've had them strip down and look in like underneath their scrotum areas." (*Id.* at 35:18–20.) Pulver testified that at the Allen County lockup (where arrestees are usually taken), "I don't believe they strip search everybody at the lock-up. I know that they pat them down real well, but there again, I don't know their protocol." (*Id.* at 36:3–5.) Pulver testified that arrestees often take evidence hidden on their person and leave it in a police car. (*Id.* at 40:18–41:6.) "[T]hat's why I do a thorough inspection before each shift to ensure there's nothing in my car. That way, if I do arrest somebody, every time I get out of lock-up I take the person out and I check to make sure they didn't throw anything in my car. I have found pipes." (*Id.* at 40:25–41:4.)

DEA Agent Foldesi testified that he had firsthand knowledge that suspects are strip searched at police headquarters if they are suspected of having narcotics on their person. (*Id.* at

42:17–24. The strip searches take place in a private, closed interview room on the sixth floor. (*Id.* at 44:2–11.) "And I'd like to interject that it's not a full naked . . . you know, strip search. It will be maybe drop the pants, check the scrotum. . . . Have them spread their rear." (*Id.* at 44: 11–15.)

## CONCLUSIONS OF LAW

The Defendant makes several arguments, but it is important to note what aspects of the incident the Defendant does not contest. The Defendant does not challenge the traffic stop or the justification for "the initial frisk," that is, the *Terry* stop. (Def. Br. in Supp. of Mot. 7.) After Pulver recovered the Defendant's knife, the Defendant concedes that "[c]ertainly, Pulver was justified in then patting down the Defendant to ensure that he was not carrying any other weapons." (*Id.*) Also, the Defendant rightly does not challenge the authority of Pulver to order the Defendant out of the car. *Maryland v. Wilson*, 519 U.S. 408 (1997).

The Court will address the Defendant's arguments in the context of the evolution of the traffic stop rather than in the order in which the Defendant presented them. First, the Defendant objects to the scope of the initial search, claiming that Pulver "groped, pulled[,] and tugged at Robinson," (Def. Reply 3), "far beyond the boundaries of a legitimate *Terry* stop," (*id.*) instead of lightly patting him down. Second, the Defendant argues that Pulver's search or sweep of the vehicle was not justified under the recent Supreme Court decision in *Arizona v. Gant*, 129 S. Ct. 1710 (2009). (Def. Reply 6–8; Def. Sur-Reply 1–5.)

Third, the Defendant objects to what he calls Pulver's additional search of the Defendant's buttocks after feeling a hard object there, which occurred after Pulver had searched

the vehicle and handcuffed the Defendant. "When Officer Pulver felt what he described as a hard object in between Robinson's buttocks and he continued to search the area by pulling down Robinson's shorts, Pulver went beyond the boundaries and parameters of a legitimate *Terry* stop and frisk and thereby violated Robinson's Fourth Amendment rights." (*Id.*) The Defendant claims this search was not a justified *Terry* search or a search incident to arrest. (*Id.*; Def. Reply 4–9.) Fourth, the Defendant claims that the forcible removal of the drugs from in between his buttocks was an unreasonable strip search. (Def. Br. in Supp. of Mot. 10–14; Def. Reply 9.)

The Government argues that the initial pat down was not too invasive and that after Pulver saw the knife and scale, both with white residue, he had probable cause to arrest the Defendant for possession of cocaine under Indiana Code § 35-48-4-6(a) (2007),[2] so the search at that point (when Pulver handcuffed the Defendant and resumed the pat down) was a search incident to arrest, thus authorizing more extensive feeling, probing, and searching. The Government argues that the present case is distinguishable from *Gant* and accordingly Pulver was authorized to search the vehicle. Last, the Government disagrees that the Defendant was strip searched and states that exigent circumstances justified the public search of the Defendant.

As discussed in detail below, the Court concludes that the Defendant's Motion to Suppress [DE 25] should be denied. First, the initial search of the Defendant was a search

---

[2] The section, entitled "Possession of cocaine or narcotic drug," provides:
A person who, without a valid prescription or order of a practitioner acting in the course of the practitioner's professional practice, knowingly or intentionally possesses cocaine (pure or adulterated) or a narcotic drug (pure or adulterated) classified in schedule I or II, commits possession of cocaine or a narcotic drug, a Class D felony, except as provided in subsection (b).
Ind. Code § 35-48-4-6(a) (2007).

incident to arrest justified by probable cause to believe that the Defendant committed the felony of possession of narcotics. Second, in the alternative, Pulver had reason to believe that the Defendant posed a threat to officer safety that justified a *Terry* pat down to confirm that the hard object in the Defendant's buttocks was not a weapon. Third, under either scenario (search incident to arrest or *Terry* pat down), the vehicle search was authorized under *Gant*. Fourth and last, the final search of the Defendant was not a strip search, and removal of narcotics from his buttocks was justified.

**A.      Search Incident to Arrest**

One of the key issues in addressing the Defendant's Motion is whether police had probable cause to arrest the Defendant, and if so, at what point. The Government argues that Pulver had probable cause to arrest the Defendant for possession of narcotics after recovering the powder-covered knife from the Defendant's pocket and the powder-covered scale from the vehicle. The Defendant attacks that argument on several fronts, including an argument that Pulver was not authorized to search the vehicle (and discover the scale) in light of the recent Supreme Court decision in *Arizona v. Gant*, 129 S. Ct. 1710 (2009). As a result, the Defendant argues, the digital scale cannot be a factor in the probable cause determination, and the arrest (and resulting search) was invalid.

"In order to make an arrest without a warrant, the police must have probable cause, under the totality of the circumstances, to reasonably believe that a particular individual has committed a crime." *United States v. Gilbert*, 45 F.3d 1163, 1166 (7th Cir. 1995). "The determination of probable cause involves 'a practical, common-sense decision whether, given all of the

circumstances set forth . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *Id.* (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). "[P]robable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Gates*, 462 U.S. at 244 n.13. "Police officers have probable cause to make an arrest where 'the facts and circumstances within their knowledge and of which they [have] reasonably trustworthy information [are] sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense.'" *United States v. Levy*, 990 F.2d 971, 974 (7th Cir. 1993) (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964). "In determining whether suspicious circumstances rise to the level of probable cause, officers are entitled to draw reasonable inferences based on their training and experience." *United States v. Reed*, 443 F.3d 600, 603 (7th Cir. 2006).

Before Pulver searched the vehicle, the suspicious circumstances in this case included the following: the Defendant's knife with white residue; the Defendant moving and shifting in his seat while Pulver was arresting the driver; and the unknown hard object in the Defendant's buttocks. While no individual circumstance just listed amounts to probable cause, when combined together, they justify arresting the Defendant for possession of illegal narcotics.

The Defendant's knife, which Pulver removed from his pocket and which was covered in white-powder, contributed to probable cause to arrest the Defendant. A knife covered in white powder is likely a tool for dividing illegal drugs. *See United States v. Brimley*, 148 F.3d 819, 821 (7th Cir. 1998) (referring to knives and other objects as drug paraphernalia). The officer did not have to field test the substance and confirm it was cocaine in order to have probable cause, as the Defendant argued, (Def. Reply 5). In *United States v. Johnson*, 383 F.3d 538 (7th Cir. 2004),

officers searching the defendant "removed his cap and, while putting it back on his head, discovered a paper packet (which fell from his hat and landed on Johnson's shoulder) containing an off-white powder, which the officers believed to be a controlled substance (powder cocaine)." *Id.* at 541. The Seventh Circuit did not require that the officers should have field tested the substance first, instead stating that "[t]his alone provided Cook with probable cause that a crime had been, or was being committed." *Id.* at 545. *See also Garcia v. City of Chicago*, 24 F.3d 966, 970 (7th Cir. 1994) (rejecting the plaintiff's claim that police had to test the white powder found with him before having probable cause to arrest him and stating that "Garcia concedes that finding a white powder in a person's possession provides probable cause to arrest that person for possession of cocaine") (citing *United States v. Potter*, 895 F.2d 1231, 1234 & n.1 (9th Cir. 1990)).

The Defendant's shifting and moving in the car, which prompted Pulver to instruct the Defendant to put his hands on the dashboard, added to the suspicion surrounding the knife. Officers rightly become concerned for safety and preserving evidence when vehicle occupants make furtive and/or anxious movements. *See, e.g.*, *Sibron v. New York*, 392 U.S. 40, 66–67 (1968) (stating that suspect's deliberately furtive movements when approached by police officers "are strong indicia of *mens rea*"); *United States v. Arnold*, 388 F.3d 237, 238, 240 (7th Cir. 2004); *United States v. Evans*, 994 F.2d 317 , 321 (7th Cir. 1993); *United States v. Nash*, 876 F.2d 1359, 1360–61 (7th Cir. 1989); *United States v. Denney*, 771 F.2d 318, 321–22 (7th Cir. 1985); *United States v. Stallings*, 413 F.2d 200, 204 (7th Cir. 1969) (stating that a passenger's furtive, anxious and manifestly evasive conduct" contributed to finding probable cause to arrest the passenger). The fact that the Defendant was shifting and moving furtively and anxiously

during a traffic stop, as opposed to during a different kind of encounter, adds to the suspicious nature of the Defendant's activity. *See Michigan v. Long*, 463 U.S. 1032, 1049 (1983) ("[R]oadside encounters between police and suspects are especially hazardous.").

The unknown, hard object near the top of the Defendant's buttocks was another factor that contributed to probable cause to arrest the Defendant. A reasonable police officer in such a situation would be concerned that, based on the powder-covered knife, the hard object in that location was either a weapon or drugs. *See United States v. Askew*, 403 F.3d 496, 508 (7th Cir. 2005) ("Drug arrests can warrant intrusive tactics because of their inherent danger. Guns are among the tools of the drug trade." (internal quotations omitted)); *Johnson*, 383 F.3d at 546 (stating that the discovery of "a banned substance" on the defendant provided "a reasonable basis for believing that more drugs" may have been concealed in the car); *United States v. Brown*, 188 F.3d 860, 865 (7th Cir. 1999) (stating that "[d]rug dealing is a crime infused with violence" and that evidence of illegal drugs led to reasonable suspicion that the defendant was armed (internal quotations omitted)); *United States v. Johnson*, 170 F.3d 708, 725 (7th Cir. 1999) ("Drugs and guns go together, and armed persons are tempted to use their weapons."); *United States v. Buchanan*, 910 F.2d 1571, 1573 (7th Cir. 1990) ("[G]uns are tools of the drug-dealing trade.").

Based on all of these factors, Pulver had probable cause at that point (prior to searching the vehicle) to arrest the Defendant for possession of drugs. Contrary to what the Defendant argues, (Def. Reply 4–5), it does not matter that Pulver told the Defendant he was not under arrest or did not announce the arrest at that moment. *United States v. Garcia*, 376 F.3d 648, 651 (7th Cir. 2004) (stating that "Fourth amendment jurisprudence . . . is objective," and "[i]t does not matter what [Officer] Bonar was thinking or planning); *United States v. Jackson*, 377 F.3d

715, 717–18 (7th Cir. 2004) (stating that "[i]t does not matter for current purposes what label the officer applied at the scene; analysis under the fourth amendment is objective"). At this point, Pulver was authorized to conduct a full search of the Defendant's person, including reaching into pockets and groping the groin and buttocks areas. *United States v. Childs*, 277 F.3d 947, 952 (7th Cir. 2002) ("[A] person stopped on probable cause may be searched fully, while a person stopped on reasonable suspicion may be patted down but not searched.").

Pulver was fully authorized to conduct the search incident to arrest for two important reasons. "[O]fficers' needs to protect themselves and preserve evidence are what justify the rule allowing searches of arrested persons." *Jackson*, 377 F.3d at 716. The facts and analysis in that case inform the analysis here:

> [Officer] Sapetti told him [the defendant]—even while slapping on the handcuffs —that he was not "under arrest" but was just being "detained" while more identity checking occurred. The officer's language does not change the facts, however: there was probable cause to believe that Jackson had committed a crime, and he was (reasonably) taken into custody. It does not matter for current purposes what label the officer applied at the scene; analysis under the fourth amendment is objective, as we discussed in *Garcia*.
>           . . . Sapetti found the drug[s] in a place from which Jackson could have retrieved a weapon had he possessed one. It would have been foolhardy to trundle Jackson into the squad car without ensuring that he was unarmed. Sapetti was entitled to reduce danger to himself before securing Jackson in the back seat for however long it took to find out who he really was. Likewise Sapetti was entitled to preserve any evidence that Jackson may have been carrying. That the search turned up drugs rather than a gun (or bogus identification) does not make it less valid.

*Id.* at 717–18. Similarly, Pulver did not announce that the Defendant was under arrest when Pulver was conducting the initial search, and Pulver did not need to do so. There was probable cause to believe that the Defendant had committed a crime (possession of illegal drugs), and it does not matter what label the officer used at the scene to describe his search. It would have been just as foolhardy to put the Defendant in the backseat of a police car without ensuring first that

he was unarmed or preserving any evidence the Defendant was hiding in his buttocks area or on his person. It also does not matter that Pulver ultimately recovered crack cocaine, rather than a weapon, from the Defendant's buttocks.

**B.      Alternative Basis: *Terry* Pat Down**

Pulver's search of the Defendant can also be upheld as an interrupted *Terry* pat down. This basis proceeds from the two cases cited and relied upon by the Defendant, *Minnesota v. Dickerson*, 508 U.S. 366 (1993), and *United States v. Rivers*, 121 F.3d 1043 (7th Cir. 1997).

The Defendant objects to Pulver's search of the Defendant's buttocks after feeling a hard object there. "When Officer Pulver felt what he described as a hard object in between Robinson's buttocks and he continued to search the area by pulling down Robinson's shorts, Pulver went beyond the boundaries and parameters of a legitimate *Terry* stop and frisk and thereby violated Robinson's Fourth Amendment rights." (Def. Br. in Supp. of Mot. 7.)

Generally, when an officer "is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others," he may pat down a person "to determine whether the person is in fact carrying a weapon." *Terry v. Ohio*, 392 U.S. 1, 24 (1968). The basis for this search is an officer's reasonable suspicion—which is less than probable cause—that criminal activity may be afoot. "[T]he police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" the pat down. *Id.* at 21. The Court's analysis of this is objective: "[W]ould the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken

17

was appropriate?" *Id.* at 21–22.

In *Dickerson*, the Court suppressed the evidence found during an officer's search because the "officer's continued exploration of respondent's pocket after having concluded that it contained no weapon was unrelated to the sole justification of the search under *Terry*: the protection of the police officer and others nearby. It therefore amounted to the sort of evidentiary search that *Terry* expressly refused to authorize." 508 U.S. at 376 (citations, brackets, ellipsis, and internal quotations omitted). The principle underlying that result stemmed from applying the plain view doctrine to tactile searches:

> If a police officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity immediately apparent, there has been no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons; if the object is contraband, its warrantless seizure would be justified by the same practical considerations that inhere in the plain-view context.

*Id.* at 375–76. The Supreme Court went on to note that the Fourth Amendment requires the officer to have probable cause that the object is contraband before seizing it. *Id.* at 376. "The seizure of an item whose identity is already known occasions no further invasion of privacy." *Id.*

In *Rivers*, the Seventh Circuit applied *Dickerson* to a tactile search and found that the search was authorized because the officer "immediately recognized the incriminating nature of the lump in Rivers's pocket," *Rivers*, 121 F.3d at 1047. The court distinguished its case from *Dickerson*: "The contraband's incriminating nature, however, must be immediately apparent to the frisking officer; in *Dickerson*, the seizure was constitutionally invalid because the officer continued to manipulate the lump in the defendant's pocket to determine its nature even after concluding it was not a weapon." *Id.* at 1046. In *Rivers*, "there was no impermissible further searching, as Moore recognized the incriminating nature of the contraband immediately." *Id.*

The search in this case is not exactly like the one in *Rivers*, but it is more like the *Rivers* search than the *Dickerson* search. Here, Pulver began a *Terry* pat down of the Defendant as soon as the Defendant stepped out of the car. The Defendant does not object to Pulver conducting this initial pat down. (Def. Br. in Supp. of Mot. 7 ("Robinson does not argue that, at the outset, the initial frisk of him was unjustified.")). In light of the facts known at that time—the Defendant possessed a knife with white residue, the Defendant had been making suspicious movements in the car, the Defendant was physically bigger than Pulver, bystanders were shouting at and quickly approaching Pulver from behind, and Pulver was by himself at this point—a prudent man of reasonable caution would believe he was in danger and must conduct the pat down of the Defendant. Pulver felt a hard object in the Defendant's buttocks but, due to the extenuating and dangerous circumstances of the situation, was unable to determine if it was a weapon or not. It was only after another officer arrived that Pulver was able to have that officer watch the Defendant so Pulver could conduct a quick weapons sweep of the vehicle and direct the bystanders to keep back. The need, based on officer safety, to conduct the weapons pat down had not abated, and these steps were necessary for Pulver to resume the *Terry* pat down and determine if the briefly felt object was a weapon. Pulver's testimony and his actions and comments on the video support this account.

Once Pulver resumed the *Terry* pat down to ensure that the Defendant did not possess another weapon, Pulver located the object in the Defendant's buttocks and immediately knew it was narcotics. Pulver's tactile *Terry* search did not go beyond what *Dickerson* authorizes. The fact that the pat down occurred in two phases was not Pulver's fault; it was due to the Defendant's lack of cooperation, the quick approach of hostile bystanders, and the Defendant's

proximity to a vehicle where weapons could have been hidden, creating the need for a vehicle-weapons sweep. Under this alternative basis, the *Terry* stop ended when the Defendant pulled away from the officers and was wrestled to the ground (resulting in an injury to Pulver), which constituted the felony of resisting law enforcement, Ind. Code § 35-44-3-3(a), (b)(1)(B).[3]

*Terry* stops must always be "reasonably related in scope to the circumstances which justified the interference in the first place." *United States v. Vega*, 72 F.3d 507, 515 (7th Cir. 1995) (quoting *United States v. Smith*, 3 F.3d 1088, 1095 (7th Cir. 1993)). "[A] stop is reasonable when the degree of suspicion is adequate in light of the degree and duration of the restraint." *Smith*, 3 F3.d at 1095 (noting that courts "consider whether the duration and scope of the stop were reasonable under the circumstances"). Some (but not necessarily all) factors to consider for this determination are the officer's intent, impressions conveyed, length of stop, questions asked, [and] search made." *United States v. Serna-Barreto*, 842 F.2d 965, 967 (7th Cir. 1988).

In this case, the duration of the interrupted *Terry* stop—starting when Pulver began the initial pat down and ending when the Defendant pulled away and was wrestled to the ground (including the interim time when Pulver was not patting down the Defendant)—was quite brief: approximately three minutes and seventeen seconds based on the Court's review of the video recording of the incident. The degree of the restraint was not particularly significant: the

---

[3] The statute defines resisting law enforcement as follows: "A person who knowingly or intentionally . . . forcibly resists, obstructs, or interferes with a law enforcement officer or a person assisting the officer while the officer is lawfully engaged in the execution of the officer's duties . . . commits resisting law enforcement, a Class A misdemeanor, except as provided in subsection (b)." Ind. Code § 35-44-3-3(a)(1). "The offense under subsection (a) is a . . . Class D felony if: . . .while committing any offense described in subsection (a), the person draws or uses a deadly weapon, *inflicts bodily injury on or otherwise causes bodily injury to another person*." Ind. Code § 35-44-3-3(b)(1)(B) (emphasis added).

Defendant merely had his hands on the car during the first phase of the *Terry* pat down, and he was handcuffed for a few minutes during the second phase of the *Terry* pat down. It was also permissible for Pulver to handcuff the Defendant when Pulver resumed the *Terry* pat down due to the dangerous circumstances of the situation. *See United States v. Stewart*, 388 F.3d 1079, 1085 (7th Cir. 2004) (ruling that it was reasonable for officers to handcuff the defendant and detain him in a police car during the *Terry* stop because of dangerous circumstances).

Additionally, Pulver's intent at this point was to locate the elusive object in the Defendant's buttocks and ensure it was not a weapon. The Defendant's lack of cooperation (placing the object in his buttocks in the first place, not informing Pulver what the object was, clenching his buttocks during the pat down, and not answering Pulver's questions truthfully) contributed to the need to continue the pat down. Pulver's questions were appropriate and reasonable: he asked the Defendant what was in the Defendant's buttocks in order to determine if it was a weapon.

Other circumstances contributing to a finding that the scope of the *Terry* pat down was reasonable are the strong possibility that the Defendant was armed (in light of the powder-covered knife) and the long-recognized danger officers face when conducting a traffic stop. Once Pulver observed evidence of narcotics, he had good reason to believe the Defendant might be armed because "[g]uns are among the tools of the drug trade." *Askew*, 403 F.3d at 508 (internal quotations omitted) ("Drug arrests can warrant intrusive tactics because of their inherent danger."). *See also United States v. Johnson*, 170 F.3d 708, 725 (7th Cir. 1999) ("Drugs and guns go together, and armed persons are tempted to use their weapons."). In addition, the Supreme Court has noted that "roadside encounters between police and suspects are especially

hazardous." *Michigan v. Long*, 463 U.S. 1032, 1049 (1983). *See also United States v. Denney*, 771 F.2d 318, 321 (7th Cir. 1985) ("[Investigative detentions involving suspects in vehicles at the roadsides are especially dangerous to the police officers."). All of these factors would lead a reasonably prudent officer to believe that his safety was in danger, thus requiring a *Terry* pat down (which happened to have been interrupted). Furthermore, subsequent events did not render this belief unreasonable. Overall, the Court concludes that the duration and scope of the interrupted *Terry* pat down in the form of a tactile search was reasonable in light of all the circumstances at the time.

## C.      The Search of the Vehicle

The Defendant argues that, under *Arizona v. Gant*, 129 S. Ct. 1710 (2009), Pulver did not have authority to search the vehicle.[4] However, the Court concludes that, under the search incident to arrest scenario or the *Terry* pat down scenario, Pulver was authorized to search the vehicle when he did.

In *New York v. Belton*, 453 U.S. 454 (1981), the Supreme Court applied the *Chimel*[5] search-incident-to-arrest doctrine to automobile searches: "[W]hen a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile." *Id.* at 460 (footnote

---

[4] The Court agrees with the Defendant that he has standing to challenge the search of the vehicle even though it was not his vehicle and he was not the driver. *Brendlin v. California*, 551 U.S. 249, 2403 (2007) (ruling that a passenger is seized during a traffic stop and "may challenge the constitutionality of the stop"); *see also Arizona v. Johnson*, 129 S. Ct. 781 (2009) (ruling on a vehicle passenger's challenge to the constitutionality of a *Terry* traffic stop).

[5] *Chimel v. California*, 395 U.S. 752 (1969).

omitted). In *Gant*, the Court ruled "that *Belton* does not authorize a vehicle search incident to a recent occupants' arrest after the arrestee has been secured and cannot access the interior of the vehicle." 129 S. Ct. at 1714. Police may "search a vehicle incident to a recent occupant's arrest only when the arrestee is unsecured and within reaching distance of the passenger compartment at the time of search." *Id.* at 1719. The Court then imposed another restriction on police: a search incident to arrest of the vehicle may only occur "when it is reasonable to believe that evidence of the offense of arrest might be found in the vehicle." *Id.* at 1714.

This result stems from *Chimel's* dual rationale of protecting officers from weapons and preserving evidence. *Id.* at 1716. "If there is no possibility that an arrestee could reach into the area that law enforcement officers seek to search, both justifications for the search-incident-to-arrest exception are absent and the rule does not apply." *Id.* The facts of *Gant* are important in relation to this case: "After Rodney Gant was arrested for driving with a suspended license, *handcuffed, and locked in the back of a patrol car*, police officers searched his car and discovered cocaine in the pocket of a jacket on the backseat." *Id.* at 1714 (emphasis added). The Court noted that those facts precluded *Chimel's* dual rationale. *Id.* at 1719.

The Defendant argues that there was no danger that he or the driver could access potential weapons in the car because the driver was secured in the back of Pulver's car and the Defendant "was at the back of the car and in the Government's own terms 'secured' by another officer." (Def. Reply 8.) Also, he argues that the driver was arrested for being a habitual traffic violator, which does not create a basis to believe drugs or weapons would be present. (*Id.*)

The facts of this case are distinguishable from *Gant*. Unlike the defendant in *Gant*, the Defendant here was not handcuffed and was not locked in the back seat of a patrol car when

Pulver searched the vehicle. Rather, the Defendant, without handcuffs, was standing a few feet behind the vehicle next to another officer. The driver's side door of the vehicle remained open at this time. Also, it is noteworthy that the Defendant's sister and girlfriend—the sister standing within reaching distance of the vehicle, and the girlfriend eventually standing several steps from the car—were drawing the attention of Pulver with questions and comments. After that, Pulver had entered the stopped vehicle and was focused on the search of that car.

Under these circumstances, the Court cannot say that the Defendant was secured, regardless of the Government's use of that term in its argument. The Defendant was in a position to quickly access the vehicle with only a few steps and retrieve any hidden weapons, especially through the open driver's side door. It is not at all clear whether the officer standing next to the Defendant would have been able to stop him,[6] and Pulver was distracted by the Defendant's sister and girlfriend and the vehicle search itself. Accordingly, in this case, the rationale of protecting police from weapons was present. *See United States v. Longmire*, 761 F.2d 411, 419 (7th Cir. 1985) ("That the officer may have the individual under his control outside of the automobile, as in this case, does not render objectively unreasonable the officer's belief that the individual is potentially dangerous." (citing *Michigan v. Long*, 463 U.S. at 1051)); *see also United States v. Boden,* 854 F.2d 983, 994 (7th Cir. 1988) (holding that a protective search inside a vehicle for weapons was reasonable even though the police had moved the subject of a *Terry* stop away from his vehicle because there was a continuing possibility that the suspect, who was not under arrest, could return to the car).

---

[6] The Defendant's strength was made evident later when he resisted and two officers were required to wrestle him to the ground and several more to hold him there while Pulver searched his buttocks and recovered the narcotics.

Also, because the Court has concluded that Pulver at this point had probable cause to arrest the Defendant for possession of narcotics, it was reasonable for Pulver "to believe the vehicle contain[ed] evidence of the offense of the arrest," that is, evidence of illegal narcotics, satisfying the other *Chimel* rationale for the search. *Gant*, 129 S. Ct. at 1723. Therefore, Pulver was authorized to search the vehicle under *Gant*.[7]

D.      **The "Strip Search," or Retrieval of the Narcotics Baggie**

The Defendant also seeks to suppress the crack cocaine from evidence on the ground that "the strip search of Robinson itself was the second violation of his Fourth Amendment rights." (Def. Br. in Supp. of Mot. 10.) This argument is based on *Campbell v. Miller*, 499 F.3d 711 (7th Cir. 2007), where the court ruled that a strip search of an arrestee was unreasonable and violated the arrestee's rights. (Def. Br. in Supp. of Mot. 10–14.)

There are several problems with the Defendant's argument and reliance on *Campbell*. First, the search of the Defendant was not a strip search. A strip search means that a person's clothes are moved or removed (by his own hand or by others) so that police can search, either visually or manually, the person's body, particular the person's private parts. *See* Black's Law Dictionary (8th ed. 2004) ("A search of a person conducted after that person's clothes have been

_____

[7] If Pulver did not have probable cause to arrest the Defendant before the search of the vehicle and discovery of the scale with white powder, he certainly had probable cause after that. Scales are frequently used in the drug trade, and it was reasonable to believe that the white powder was cocaine or some other illegal drug. *See United States v. Bond*, 847 F.2d 1233, 1243 (7th Cir. 1988) (noting that officers "may well have had probable cause as soon as they saw the scales on the backseat of the car"), abrogated on other grounds by *Rutledge v. United States*, 517 U.S. 292 (1996). The scale, combined with the other facts and circumstances already discussed—the Defendant's suspicious and furtive movements in the car, the knife with powder residue, and the hard object in the Defendant's buttocks—created probable cause for Pulver to arrest the Defendant for possession of narcotics. Thus, when Pulver exited the vehicle, returned to the Defendant, handcuffed him, and resumed searching his person, he was performing a search incident to arrest and was authorized to reach into the Defendant's shorts and remove the hard object from the Defendant's buttocks. *Childs*, 277 F.3d at 952 ("[A] person stopped on probable cause may be searched fully.").

removed, the purpose usu. being to find any contraband the person might be hiding."). In this case, police did not remove the Defendant's clothing; officers only adjusted his shorts. Also, Pulver was not *searching* for anything. Because Pulver had felt the object and recognized it as narcotics, Pulver knew the Defendant had narcotics secreted in his buttocks, and Pulver was *retrieving* it.

Pulver also made clear that the cue ball sized baggie was near the top of the buttocks, not deep in the crack near the anus, and the Defendant did not dispute that during his own testimony. Pulver testified that he pulled the Defendant's shorts only two or three inches down the Defendant's buttocks; the Defendant claims that his shorts were much lower. The Court credits Pulver's testimony on this point for several reasons: Pulver was in a better position to see how far the shorts were down (the Defendant claims an officer had a foot on his neck, so it is doubtful he could look down at all); and his testimony was consistent about the location of the baggie near the top of the buttocks crack and about not needing to put his hand farther down the buttocks crack. Also, the Defendant never claimed that he had pushed the baggie far down his buttocks crack or that Pulver reached that far down. The video showing the Defendant's shorts being lower than two or three inches (when officers picked the Defendant up and placed him in the police car) is not inconsistent with this finding. The Defendant continued to struggle after Pulver removed the narcotics baggie, and Pulver testified that he did not know if he pulled the Defendant's shorts back up, so it reasonable to conclude that the Defendant's shorts fell lower during his continuing struggle after the drugs were removed from the top of his buttocks.

The Defendant claims that his penis and scrotum were exposed and that his penis was on the ground during the search, thus making it more like a strip search than a regular search. The

Court finds that the Defendant's testimony about this matter is not credible. The Defendant produced no additional witnesses (beyond himself) to testify to this fact even though his sister, girlfriend, and other onlookers were at the scene during the search. Pulver testified to the contrary, stating that he did not believe that the Defendant's genitals were exposed and he intentionally did not pull the Defendant's shorts that far down because Pulver was aware of the onlookers and the potential for embarrassment. Pulver's testimony was consistent throughout the hearing and bore the hallmarks of credibility. The Court credits his testimony on this point, believing his account of whether the Defendant's genitals were exposed rather than the Defendant's account. Even if the Defendant was correct about this claim, it is very doubtful that onlookers could see the Defendant's genitals due to the fact that the Defendant was facedown, his shorts were still on, and several officers were standing around.

The conclusion that the search in this case was not a strip search finds support in the Seventh Circuit's descriptions of strip searches in *Campbell* and other cases. In *Campbell*, officers took the arrestee into a back yard, a location that was visible from three different houses, and then "undid Campbell's belt buckle, pulled his pants partway down, and had him lean forward. Miller then separated Campbell's buttocks and did a 'visual inspection' so as to 'make sure he had nothing shoved into his anal area . . . .'" 499 F.3d at 715. The opinion does not state how far the pants were down, but they must have been much further than the Defendant's shorts in this case so as to enable Officer Miller to look as far down as Campbell's "anal area" to make sure "nothing [was] shoved" in that area. *Id.* (characterizing the search as "a visual inspection of Campbell's anal cavity"). Here, Pulver did not inspect the anal area, only the top of the buttocks where the drugs were located. Also, there was no testimony that Pulver separated (or had to

separate) the Defendant's buttocks. In *Mary Beth G. v. City of Chicago*, 723, F.2d 1263 (7th Cir.

1983), cited repeatedly in *Campbell*, the challenged strip search policy required an arrested

woman at city lockups to

> 1) lift her blouse or sweater and to unhook and lift her brassiere to allow a visual
> inspection of the breast area, to replace these articles of clothing and then 2) to
> pull up her skirt or dress or to lower her pants and pull down any undergarments,
> to squat two or three times facing the detention aide and to bend over at the waist
> to permit visual inspection of the vaginal and anal area.

*Id.* at 1267. This sort of invasive visual search of the genital and anal areas is far different than

what occurred in this case.

In *Iskander v. Village of Forest Park*, 690 F.2d 126 (7th Cir. 1982), also cited in

*Campbell*, the strip-searched arrestee "disrobed," *id.* at 129. In *United States v. Williams*, 209

F.3d 940 (2000), a case with factual similarities to this case, the court described how an officer

performing a pat down search felt an object in the cheeks of the defendant's buttocks. *Id.* at 944.

The defendant fled, and the officer tackled him and pepper sprayed him "before he could get him

under control. [Officer] Lewis retrieved the object by sliding his hand under Williams'

waistband and down the back part of his pants. Williams was never disrobed or exposed to the

public." *Id.* The court characterized this as a search incident to arrest and not a strip search. *Id.* at

943–44. In *United States v. Brack*, 188 F.3d 748 (7th Cir. 1999), an arrestee was told "to undress

and turn around. When he did so, [Officer] McMahon observed a piece of tissue on the crease of

Brack's buttocks. At McMahon's instruction, Brack removed the tissue and two plastic bags," *id.*

at 758, which contained drugs. These cases make clear that a strip search entails total removal of

clothing or removal so significant that a person's anal and genital areas are clearly visible to

another person present. The Defendant in this case simply did not involve the removal of

clothing and inspection of the body area normally attendant to a strip search.

Regardless of what label is put on the search in this case, the Court still applies the reasonableness analysis to this aspect of the search incident to arrest. *Williams*, 209 F.3d at 943. This standard comes from *Bell v. Wolfish*, 441 U.S. 520 (1979). *See Williams*, 209 F.3d at 943; *Campbell*, 499 F.3d at 416.

> The test of reasonableness under the Fourth Amendment . . . requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.

*Wolfish*, 441 U.S. at 559. In *United States v. Robinson*, 414 U.S. 218 (1973), the Supreme Court made clear that police have broad discretion and leeway in performing searches incident to arrest, the purpose of which is to disarm the arrestee and preserve evidence. *Id.* at 234–35.

> A police officer's determination as to how and where to search the person of a suspect whom he has arrested is necessarily a quick *ad hoc* judgment which the Fourth Amendment does not require to be broken down in each instance into an analysis of each step in the search. . . . It is the fact of the lawful arrest which establishes the authority to search, and we hold that in the case of a lawful custodial arrest a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment, but is also a "reasonable" search under that Amendment.

*Id.* at 235. The Seventh Circuit noted that *Robinson* "condoned 'a relatively extensive exploration of the person, but stated that it would find unconstitutional a search that was 'extreme or patently abusive.'" *Campbell*, 499 F.3d at 717 (quoting *Robinson*, 414 U.S. at 235–36) (citations omitted).

As the Court has already discussed, the scope of the intrusion in this case was not as severe as a typical strip search. Only two or three inches of the Defendant's buttocks were revealed during the search, and there was no testimony or evidence that bystanders saw his

buttocks, let alone his genitals. Even if bystanders did see a few inches of the Defendant's buttocks, that is hardly the "demeaning, dehumanizing, undignified, humiliating, terrifying, unpleasant, embarrassing, [and] repulsive" exposure discussed in *Mary Beth G.*, 723 F.3d at 1272. Based on the evidence before the Court, Pulver did not reach far down in between the Defendant's buttocks near the anus; he only removed the baggie located higher up and visually checked to make sure nothing else was near it.

The Court is not unaware that the Defendant suffered some embarrassment and humiliation because his pants were pulled partway down on a city street while his sister and girlfriend were nearby. However, a number of factors show that this was not extreme or patently abusive. The number of officers standing around the Defendant prevented a clear and open view of the Defendant's buttocks. Pulver testified that it was important to retrieve the narcotics immediately rather than put the Defendant in a patrol car where he could, during transport, either push the drugs even deeper into his buttocks or discard the baggie into the car and claim it did not belong to him. Last and most importantly, the Defendant's lack of cooperation in identifying the object in his own buttocks in response to Pulver's comments and questions—the Defendant replied, "Like what? That's my damn ass."—and then his resistance to the search necessitated that officers put him on the ground and lower his shorts enough so that Pulver could retrieve the contraband.

The manner in which the search was conducted may at first blush appear rough, but that was a result of the Defendant's refusal to answer Pulver's questions and comply with Pulver's commands and the Defendant's struggle while on the ground. Pulver repeatedly told the Defendant to relax, but the Defendant pulled his body away, repeatedly screamed that he was

being raped, and resisted the effort to retrieve the baggie from his buttocks by keeping his buttocks clenched. The justification for initiating the search is plain: Pulver was worried that the Defendant was armed with a hidden weapon, and then Pulver determined that the hard object was narcotics. Pulver was fully justified in searching for and retrieving the object both under a search incident to arrest and a *Terry* pat down analysis, as the Court determined above.

The Defendant makes much ado about the location of the search, namely, the fact that it occurred on a street in front of onlookers instead of at police headquarters on Creighton Street (a relatively short drive from the location of the traffic stop) in a private interview room. However, Pulver had good reason to conduct the search immediately: he feared that the Defendant would push the narcotics farther into his buttocks (which would have entailed a more invasive search later) or that the Defendant would try to discard it on the ground or in the car. The presence of other officers around the Defendant reduced the ability of onlookers to see the Defendant's barely exposed buttocks. Like the arrestee in *Williams*, the Defendant here "was never disrobed or exposed to the public." 209 F.3d at 944. In addition, courts should be reluctant to second guess a split-second decision on how officers carry out a search incident to arrest. *Robinson*, 414 U.S. at 235 ("A police officer's determination as to how and where to search the person of a suspect whom he has arrested is necessarily a quick *ad hoc* judgment which the Fourth Amendment does not require to be broken down in each instance into an analysis of each step in the search.").

This case is similar to *United States v. Thomas*, 512 F.3d 383 (7th Cir. 2008), another case where police recovered drugs from in between the defendant's buttocks. There, the court rejected the defendant's argument that the *Terry* search of the defendant's buttocks in daylight

and in public in front of the defendant's wife was unreasonable. *Id.* at 389. Based on the district court's findings that the officer's account of the buttocks search was the true account (and that the defendant's claims about the officer inserting "the tip of his finger into Thomas's anus" were false), the Seventh Circuit rejected the characterization of the search as a cavity search and instead said it "was reasonable in scope, manner, and justification." *Id.* In the same way, this Court has found that Pulver did not remove the Defendant's shorts or pull them all the way down his buttocks, and that Pulver did not insert his finger into the Defendant's anus but only removed the narcotics baggie from near (about three inches) the top of the Defendant's buttocks. As a result, this Court concludes that Pulver's search of the Defendant's buttocks was also reasonable in scope, manner, and justification.

In sum, the Court concludes that the search incident to arrest (which was not a strip search) of the Defendant involving the retrieval of a baggie from the Defendant's buttocks was reasonable in light of the circumstances.

**E.      Alternative Basis to Deny Motion: No Grounds for Suppression and Inevitable Discovery Doctrine**

Even if Pulver's search (whether it is classified or labeled as a search incident to arrest, a *Terry* search or pat down, or strip search) of the Defendant did violate the Defendant's rights, that is not necessarily a basis to suppress the evidence in this particular case. The Defendant did not address why a finding that the Defendant's rights were violated would necessarily require the Court to suppress the evidence.

The general exclusionary rule states that unlawfully discovered evidence may not be used against a defendant. This "is a judicially created remedy whose prime purpose is to deter future

32

unlawful police conduct." *United States v. Fazio*, 914 F.2d 950, 957 (7th Cir. 1990) (citations and internal quotations omitted). However, exclusion is not automatic:

> The Court has declined to adopt a *per se* or but for rule of causation that would render inadmissible all evidence discovered through a chain of causation that started with illegal police action. . . . Instead, the Court has determined that the exclusionary rule should not apply when the causal connection between illegal police conduct and the procurement of evidence is so attenuated as to dissipate the taint.

*Id.* (internal quotations omitted). Also, the Seventh Circuit has noted that "exclusionary rules have fallen out of favor . . . ; we find today's Supreme Court saying that 'suppression of evidence . . . has always been our last resort, not our first impulse,'" *Samuel v. Frank*, 525 F.3d 566, 570 (7th Cir. 2008) (quoting *Hudson v. Michigan*, 547 U.S. 586, 591 (2006)). The parties did not address in detail whether the exclusionary rule should apply in a case like this, but that argument and the factors guiding that determination need not be addressed because of the inevitable discovery exception.

This exception "permits the introduction of evidence that eventually would have been located had there been no error." *United States v. Jones*, 72 F.3d 1324, 1330 (7th Cir. 1995). "If the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means . . . then the deterrence rationale has so little basis that the evidence should be received." *Nix v. Williams*, 467 U.S. 431, 444 (1984). The Seventh Circuit has admonished that the Government typically must meet this standard of proof with evidence (and not merely memoranda), *Jones*, 72 F.3d at 1334, which the Government has done in this case with the testimony of Pulver and Foldesi, rather than "imagin[ing] in retrospect lawful avenues," *id.*

In this case, the Court has already determined that there was probable cause to arrest the

33

Defendant for possession of narcotics after Pulver recovered the powder-covered knife (based on the knife, the Defendant's suspicious movements in the car, and the hard object in the Defendant's buttocks), and if not then, after Pulver discovered the powder-covered scale in the vehicle. (The fact that Pulver had not announced that the Defendant was under arrest, or even that Pulver did not consider the incident to be an arrest at that point, is irrelevant because of the objective analysis. *Jackson*, 377 F.3d at 717–18.) There are several possible outcomes of an arrest of the Defendant, and all of them would have definitely resulted in law enforcement officials discovering the narcotics baggie in the Defendant's buttocks. Most arrestees in Fort Wayne are taken to the Allen County lockup where a more thorough search would have been performed, as Pulver testified. This more thorough search would have certainly led to the discovery of the narcotics baggie.

Some drug suspects are taken to police headquarters for an interview and are subjected to a strip search, which includes a visual inspection of the anal and genital areas, as Foldesi testified. This too would have resulted in discovering the Defendant's narcotics. Last, the Defendant could have tried to discard the narcotics baggie while handcuffed in a "full cage," a screened-in police car, (Hr'g Tr. at 31:4–11), but Pulver made clear that he thoroughly inspects that area "before each shift to ensure there's nothing in my car. That way, if I do arrest somebody, every time I get out of lock-up I take the person out and I check to make sure they didn't throw anything in my car. I have found pipes." (*Id.* at 41:1–4.) In that event, Pulver would have found the discarded baggie and known that it came from the Defendant.

Therefore, even if Pulver's search (however it is characterized or labeled) of the Defendant violated the Defendant's rights, the Court would not suppress the evidence because

authorities inevitably would have discovered it. *See, e.g.*, *United States v. Goins*, 437 F.3d 644, 650 (7th Cir. 2006) (ruling that even though police opened a gun case during a search in violation of the Fourth Amendment, the evidence "would eventually have been legally discovered" so it was not suppressed); *United States v. Woody*, 55 F.3d 1257, 1270 (7th Cir. 1995) (ruling that even if a search of a glove compartment was illegal, police still would have discovered the evidence during a mandatory inventory search of the impounded vehicle).

**CONCLUSION**

For the foregoing reasons, the Court DENIES the Defendant's Motion to Suppress [DE 25]. By a separate notice, the Court will set a telephone status conference to schedule a final pretrial conference and trial.

SO ORDERED on July 13, 2009.

 s/ Theresa L. Springmann
THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT